### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL KNUTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 15 C 2666 |
| | ) | |
| WEXFORD HEALTH SOURCES, | ) | |
| INC., ILLINOIS DEPARTMENT | ) | |
| OF CORRECTIONS, MICHAEL | ) | |
| LEMKE, SALEH OBAISI, | ) | |
| ANN HUNDLEY DAVIS, NURSE | ) | |
| DOE #1, and NURSE DOE #2, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

On July 7, 2015, Michael Knuth ("Knuth") filed his three-count Amended Complaint against Wexford Health Sources, Inc. ("Wexford"), the Illinois Department of Corrections ("IDOC"), Michael Lemke ("Lemke"), Dr. Saleh Obaisi[1] ("Obaisi"), Dr. Ann Hundley Davis ("Davis"), Nurse Doe #1, and Nurse Doe #2.[2] As the only parties served in the action, we refer to Wexford, IDOC, and Lemke as the collective

---

[1] Knuth refers to Dr. Obaisi throughout his Amended Complaint as "Dbaisi." As pointed out by various defendants – and uncontested by Knuth – this appears to be a typo; "Obaisi" is the defendant's correct name.

[2] Wexford, in its reply brief, represented to the Court that Knuth has made no effort to serve any of the individually named doctor-defendants. Obaisi, Davis, and both Nurses Doe are consequently dismissed from this action, without prejudice, pursuant to Federal Rule of Civil Procedure 4(m).

"Defendants." On January 22, 2016, we dismissed Count II of the Amended Complaint, Knuth's breach of contract claim. Still pending are two counts: Count I, a "Failure to Provide Adequate Medical Treatment" claim brought via 42 U.S.C. § 1983 and pursuant to the Eighth and Fourteenth Amendments; and Count III, a state law "Intentional Infliction of Emotional Distress" cause of action. Knuth states both counts against all Defendants.

Now before the Court are two motions for summary judgment, one from Wexford and one from Lemke and IDOC, seeking judgments in their favor on both remaining counts, as well as Wexford, Lemke, and IDOC's motions to strike various portions of evidence proffered by Knuth. For the following reasons, the Court grants Defendants' motions for summary judgment and enters judgment in Defendants' favor on Counts I and III.

## BACKGROUND

The following facts taken from the record are undisputed, except where otherwise noted.

### a. Parties & Places

Knuth is an inmate currently housed at Menard Correctional Center. Between November 15, 2010 and November 17, 2016, he was incarcerated at the State of Illinois' Stateville Correctional Center ("Stateville"). Knuth has no medical training.

During Knuth's period of confinement at Stateville, the prison utilized medical providers from both the State of Illinois as well as those contracted to it from

Wexford. IDOC is the state agency that administers all State of Illinois correctional centers. Lemke, whom Knuth is suing in both his personal and official capacity, was the acting warden of Stateville between January 1, 2013 and December 31, 2013.

Dr. Obaisi is a medical doctor with training in general surgery and urgent care who has served as the medical director at Stateville from 2012 through the present. In his role as medical director, Obaisi's primary duties include examining patients, making necessary referrals when needed, and supervising other medical staff. He also spends a small portion of time attending to administrative tasks. Knuth also cites to a portion of Dr. Davis' testimony for the assertion that inmates with chronic injuries and those treated with opioids were under the care of Obaisi. In full, the relevant section of Davis' cited testimony actually reads, "It was our practice at Stateville that anyone who was going to be on narcotics [sic] to be managed by the medical director…."

Dr. Ann Hundley Davis is a medical doctor, board-certified in the specialty of family medicine. From April 2013 until August 2014, she was employed by Wexford as a medical doctor at Stateville.

**b. Stateville Medical & Non-Medical Policies, Procedures, & Practices** Dr. Obaisi testified to the importance of both treating patients with back pain complaints conservatively and exhausting all non-surgical treatment options, as surgical intervention frequently fails. Such treatment, which can result in symptomatic relief, includes braces, steroid injections, exercise, and pain medications, such as narcotics, non-steroidal anti-inflammatory drugs ("NSAIDs"), and muscle relaxants. Obaisi

stated that, when possible, physicians try to avoid prolonged narcotic use to evade potential dependency issues. Prolonged use of a single pain medication can also diminish its effects on patients.

Obaisi also testified that, in prison settings, narcotic medications are frequently sold by inmates to one another. Knuth disagrees, specifically as such a characterization applies to the instant matter, noting that there is no proof in the record that narcotic medications were sold by Stateville inmates or Knuth in this case. Knuth also points out that, according to Wexford policy, controlled substances were subject to Direct Observed Therapy, where inmates were to be watched as they took such medications.

The pharmacy at Stateville that dispenses medications is controlled by IDOC.[3] Inmates are not allowed to keep narcotics in their cells. When inmates are prescribed narcotics, such medications are delivered to the inmates on a dose-by-dose basis. Wexford's physicians prescribe those medications they feel are medically necessary, and they are not limited in the medications that they prescribe.

The decision as to whether a patient should be sent to an outside specialist lies with Stateville medical staff. The scheduling of outside appointments, however, is a security

---

[3] In response to Wexford's Local Rule 56.1 statement of this fact, which cites to a relevant portion of the record, Knuth merely states, "Disagree," without any citation to the record. A response to a movant's statement of fact must contain, "in the case of any disagreement, specific references to the affidavits, parts of the records, and other supporting materials relied upon." N.D. Ill. R. 56.1(b)(3)(B). Knuth has failed to so reference; we therefore adopt Wexford's characterization of this fact. *See Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809—10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's noncompliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed").

concern left to IDOC.  Once an inmate is referred to University of Illinois at Chicago Hospital ("UIC Hospital"), it is IDOC and UIC, not Wexford, that determines when the inmate's appointment is scheduled.

On occasion, the Stateville Correctional Center goes into facility-wide lockdown for safety and security concerns.  Determinations of when the facility goes on lockdown are made by IDOC.  During a lockdown, there is no inmate movement, including to the health care unit ("HCU") for appointments.  Such appointments may be cancelled and rescheduled.[4]

### c. Wexford's Policies & Procedures

As to the medical unit at Stateville, Dr. Obaisi testified, "We always try to satisfy [IDOC] recommendations, regulations.  Wexford makes sure that their regulations and IDOC regulation goes hand-in-hand.  They are basically the same."  The parties clash on the upshot of this testimony, which Wexford construes as evidence of its own policies being superseded by those of IDOC.  Knuth disagrees, insisting that Wexford employees are subject to both Wexford policy as well as IDOC policy.

Per Wexford's Provider Handbook ("Handbook"), when an inmate is referred out of the prison for community physician services, Wexford employees maintain responsibility over the inmate.  As to Wexford's recordation process, the Handbook

---

[4] Before listing his many cancelled appointments, Knuth states that "Dr. Obaisi cancelled appointments with Knuth," going on to cite a number of lockdown cancellations.  The documents to which Knuth cites for this statement of fact do not support the assertion that Obaisi himself exercised any sort of discretion or decision-making authority in the cancellation of these appointments.  Moreover, Knuth agreed with Wexford's characterization of lockdown cancellations as the result solely of IDOC decision-making.

5

provides as follows:

> Record adverse events promptly and accurately. For example, refusals of treatment and your efforts to alter that decision; reasons for "noshow"…; threats…; seemingly bizarre statements or actions and activities that contradict inmate claimed medical problems. These are but a few of the possibilities. Remember – if it isn't recorded, it didn't happen!

The Handbook also provides for the manner in which such records should be made:

> Keep your entries objective, descriptive, and concise. Personal conflicts have no place in medical charts. Resolve conflicts before making a note. Leave your personal feelings for direct discussion. Do not criticize either medical or correctional staff in an individual's medical chart.

The Wexford Medical, Psychiatry, and Dental Staff Orientation Program ("Orientation Program") includes a section on Medical Autonomy. The section states that "decisions and actions regarding health care services provided to inmates are the sole responsibility of qualified health care personnel and are never compromised for security reasons." The Orientation Program also makes clear that security and administrative staff should not become involved in providing direct medical treatment or considering the validity of health requests. The same section also notes, "the primary function of a correctional institution is security, not medical services. At times other institutional activities may interfere with your ability to see a particular patient."

The Handbook also includes a note on the effectiveness of physical therapy for patient-inmates. The section reads, in part:

> Physical therapy modalities are also helpful adjuncts, but have a limited scope of effectiveness. Their application, for example, in longstanding chronic back cases may soothe the mind, but does nothing to soothe the

6

> back. Back braces, corsets and similar adjuncts for use in chronic back
> cases are often requested, but their use is not supported in the literature.

The Orientation Program discusses back-specific mattress requests, as well. It states

that Wexford policy is that "[c]ards for double mattress…are never given." The

Orientation Program makes clear that such special equipment requests

"are security or comfort issues not medical issues."

The Handbook also discusses the level of community care to be afforded to patient-

inmates. It compares inmate health problems to "worker's compensation" cases, stating

that conditions that occur "in conjunction with, or [are] aggravated by incarceration,

[are] the responsibility of [IDOC] (thus the medical contractor) to treat or correct it."

The Handbook goes on to note that "[c]onditions that are pre-existing, chronic, and

stable require monitoring only." Medical conditions should be identified, however, "on

entry, or as early as possible, and [the medical staff should] design a program of

individual care that seeks to maintain inmate health during incarceration."

### d. Knuth's Back Pain & Other Injuries

On July 20, 2009, Knuth was shot nine times during an altercation with police,

sustaining multiple bullet wounds in his right arm and hand and a single wound in his

left lower back/flank area, where the bullet still remains. As a result of the injuries to

his right arm, Knuth has nerve damage, tendon malfunction, and limited use of his arm.

He also continues to experience pain throughout his body. Knuth was admitted to IDOC

in 2009 for charges stemming from this altercation.

Prior to his current term of incarceration, Knuth had a history of alcohol problems, to which he attributes complications with nerve damage and neuropathy to his hands and legs. This neuropathy, which was diagnosed before Knuth's imprisonment at Stateville, results in burning, throbbing, and shooting pain in his arms and legs.

In late 2011 or early 2012, Knuth began to experience what he described as "shooting pains" in his back. He was later diagnosed with degenerative disc disease, spondylosis of the spine, and spinal stenosis. His back pain is worst in his "lower right back." Knuth contends that, because he "was still in pain all day every day," he never received proper treatment for his back complications.

While at Stateville, Knuth began receiving treatment for his back pain no later than February 2012, when he was seen and evaluated by a physician. Knuth received x-rays and was prescribed an anti-inflammatory to help alleviate his pain. According to medical documents, between February and early April 2012, Knuth was seen at least twice in the HCU. On April 9, Obaisi prescribed Knuth the narcotic pain killer Norco for his back pain. Per Knuth's medical documents, between April 9 and August 27, 2012, Knuth was seen in the HCU or by medical staff at least four times, no-showed at least one appointment, and missed at least three appointments due to facility lockdown or security reasons. On August 27, when he was seen by Obaisi,

Knuth was prescribed the NSAID Naproxen to treat his back pain. Obaisi also requested a follow-up visit for six weeks out. That follow-up, scheduled for October 8, 2012, was cancelled because of a facility-wide lockdown.

8

Between August 27 and the end of November, Knuth's medical records reflect that he was seen in the HCU or by medical staff at least twice and missed another appointment due to a facility-wide lockdown at least once. On November 26, 2012, Knuth informed cellhouse personnel that he was experiencing severe back pain and needed his pain medications renewed. He was seen by Dr. Obaisi the same day, who prescribed him a back brace and continued his Naproxen prescription. Knuth was also given an injection of a steroid – dopamine plus lidocaine – into his lower back. On December 24 of the same year, Knuth was again seen in the HCU, where he was prescribed an analgesic balm for his back pain.

The next year, Knuth's requested January 17, 2013 appointment with a physician was cancelled due to a facility-wide lockdown. Knuth was instead seen by health care staff the next day, on January 18, and received an order for new pain medications. On February 10, 2013, Obaisi renewed Knuth's prescription for Norco and the NSAID Toradol.

According to his medical documents, Knuth was next seen by medical staff in his cellblock on March 10, 2013. Knuth's medical records then reflect a March 21 appointment that was cancelled because there was no provider available that day. The appointment was rescheduled for the next day, March 22. Wexford contends that this was an appointment with Dr. Obaisi. Indeed, the relevant medical record reads, "Med. Dir. Cancelled due to no provider." Wexford also states that Knuth did not show up to his rescheduled appointment the next day, reflected in an entry in the medical record

that reads, "No Show for MH appt. Reschedule." Knuth disagrees with this characterization, insisting that "MH appt." indicates a Mental Health appointment, not a visit with Obaisi. Knuth also disputes Wexford's contention that inmates have the right to refuse to go to a medical appointment. Knuth asserts that inmates do not reschedule appointments, which are handled by a scheduler in the medical department. On April 6, 2013, Knuth complained to cellhouse staff that his "back went out." He was immediately transferred to the HCU, where he was evaluated by a nurse. The nurse contacted Obaisi for instructions, who then ordered Knuth narcotic pain medications and anti-inflammatory medications.

On April 13, 2013, Obaisi treated Knuth's back with one injection each of Depo-Medroe in his right and left sacroiliac joints. Obaisi testified that he believed Knuth was subsequently placed in the infirmary for a couple of days. The medical records reflect that Knuth was actually admitted to the infirmary five days prior, on April 8, after complaining of back pain. On the day of his admission, a medical note indicates that Knuth was sitting up in a chair playing a board game, laughing and talking with his cellmate. The same note also includes a notation of "No Pain." The next day Knuth was experiencing what a medical note reads as "low back pain radiating down left leg." The following day, Knuth was documented as having gotten up out of his wheelchair without issue or distress to adjust his television. The note also states that when Knuth saw the nurse observing his movement, "he sat back."

10

Knuth was documented as having complained of severe back pain throughout the rest of the day, but he refused to take any pain medications other than the prescribed narcotic. The medical records also reflect that prescriptions of narcotics and prescription-grade muscle relaxants were ordered during Knuth's infirmary stay, as were x-rays, a back brace, and an abdominal binder. On April 16, Obaisi again saw Knuth and discharged him from the infirmary to his housing unit. The following week, on April 23, Obaisi saw Knuth for his back, noting that Knuth's pain had reduced and he was ambulating well using a single crutch. Knuth was prescribed another week with the crutch and was given a prescription for the NSAID Mobic to treat his back condition. On April 30, 2013, Knuth was seen by Dr. Davis, who ordered an x-ray of his pelvis and lumbosacral spine. Davis also prescribed Knuth a range of motion exercises, Tylenol, and analgesic balm to treat his back pain. The x-rays revealed chronic arthritis in Knuth's back along with degenerative disc disease, a complicated condition with many different treatments, where the discs between the vertebrae become smaller, potentially resulting in compression of the nerves. Dr. Davis testified that the vast majority of times, the cause is unknown, but it is a condition which becomes more common as people age. In Knuth's case, his back pathology explained his pain complaints. Additionally, no doctor has told him what caused the issues in his back. As a result of this visit, Davis consulted with a pharmacist and prescribed Knuth a tricyclic antidepressant as an additional medication for his chronic and neuropathic pain.

The next month, Knuth missed appointments with Dr. Obaisi on May 3, 8, and 10 due to facility-wide lockdowns. Wexford disputes that the medical records reflect an appointment for May 3, although multiple documents do plainly reference a May 3 date having been cancelled. On May 21, 2013, Knuth was again evaluated by Davis, who increased his anti-inflammatory medication, added a twice-daily Norco prescription, and prescribed him Elavil, a drug used to treat chronic pain. That same date, a Stateville permit was issued authorizing a "Low Bunk" and "Low Gallery" for Knuth's use, to last for one full calendar year, from May 21, 2013 through May 21, 2014. On May 28, 2013, Knuth was given a permit for an abdominal binder to treat his back pain. Three days later, on May 31, Davis gave Knuth a general exam and prescribed him Norco to manage his back pain. According to his medical records, Knuth saw medical staff in his cellblock twice in June, but had his June 10 appointment cancelled due to a facility lockdown.

On July 9, 2013, Knuth was once again treated for his back condition by Dr. Obaisi, who prescribed the NSAID Indocin. Obaisi testified that he prescribed Indocin because it is more potent than Mobic. That same day, Obaisi submitted a request for a CT scan of Knuth's back. The following day, on July 10, Knuth fell while in the prison yard, experienced severe back pain, and was taken to see Obaisi.

Knuth was prescribed Norco, which he testified to having alleviated his pain, helped him walk, and aided the stretching of his back. Knuth also received an injection of Toradol. On July 20, at a follow-up treatment with Dr. Davis, Knuth received another

injection of Toradol, a one-time dose of Norco, and a prescription for an additional four days of Norco.

Four days later, on July 24, Knuth fell in the Stateville dining area. He was brought to see Obaisi, who prescribed Knuth the narcotic painkiller Ultram, also known as Tramadol, and kept Knuth in the HCU until the new medication took effect. During this interval, Knuth's medical records indicate, "pain in back out of proportion to action and movements observed." Two days later, Knuth's back gave out and he fell down some stairs. He was evaluated and found to have no visible signs of injury. Obaisi renewed his Norco prescription and requested a follow-up appointment.

The next month, on August 2, 2013, Knuth complained of a right hip issue, presented to the HCU holding his left hip, but quickly switched to holding his right hip. He was seen by Dr. Obaisi, who changed Knuth's anti-inflammatory medication from Naproxen to Motrin, and his Norco prescription to Tramadol. Obaisi also prescribed a medication to reduce stomach acid and make the new anti-inflammatory medication more tolerable. Knuth's medical records reflect that he was also seen by medical staff in his cellblock on August 31. On September 6, 2013, Knuth was given another permit for a low bunk and low gallery, alongside authorization for a crutch, a waist chain, and an abdominal binder.

On October 11, 2013, Dr. Davis examined Knuth for his back pain, who indicated that the medication was helping and he was feeling better. Davis prescribed Knuth a decreased dose of Tramadol and began to wean him off of narcotics. Davis

explained that, because Knuth was responding well to the medication, it was necessary to begin weaning him off of narcotic painkillers.

Two weeks later, on October 25, Knuth's back was imaged via CT scan at Presence St. Joseph Hospital in Joliet, IL. The CT scan resulted in a further diagnosis of degenerative disc disease causing foraminal stenosis at the L5-S1 vertebrae. Treatment for such a condition entails symptomatic treatment of pain complaints. The parties agree that Knuth's problems stem from a degenerative and progressive condition, in that it will worsen over time, even with proper treatment. Instead of directing treatments at reversing the condition, which would be ineffective, treatment is directed at the symptoms. Per his medical records, Knuth was seen by medical staff at least once in both November and December of 2013. He was also recorded as having "no showed" a January 13, 2014 appointment.

Dr. Obaisi testified that, over three months later, on January 29, 2014, he referred Knuth to Dr. Siemionow ("Siemionow"), an orthopedist, to determine if Knuth should undergo spinal surgery. The referral was approved on February 3, at which point it was up to UIC to schedule the evaluation. Obaisi also testified that, on February 10, he met with Knuth to receive the results of the CT scan. After his February 10 appointment with Obaisi, Knuth's medical records reflect at least two more visit with medical staff prior to April 2014.

On April 2, 2014, Knuth was seen by a nurse on sick call, who sent him to the

HCU, where he was subsequently evaluated and given an appointment with Dr. Obaisi. As a result, Obaisi performed a steroid injection on April 5. On April 15, Knuth "no showed" his appointment, but had an order to refill Motrin entered by a physician's assistant the following day, on April 16. Per his medical records, Knuth was next seen in the HCU on May 1, had a May 13 appointment rescheduled due to time constraints, was seen by the HCU on June 4, and had his June 6 appointment rescheduled due to time constraints, as well. On June 9, 2014, Knuth was scheduled for a renewal of his Motrin prescription. The parties disagree as to whether Knuth was, in fact, given his Motrin prescriptions on April 16 and June 9. Notations from June 16 appear to reflect a number of prescriptions having been refilled.

Knuth's medical records then reflect the following sequence of events from July 2014 through Septemeber 2014. His July 1 appointment was cancelled because no medical provider was available, as was his next appointment on July 9 as a result of Knuth's "no show." He was then seen by the HCU on both July 14 and July 22. Knuth's next appointment of August 1 was also rescheduled because of an absent healthcare provider. He was seen by the HCU on August 18 and had his subsequent September 4 date cancelled and rescheduled because no medical provider was available.

Knuth's subsequent 2014 medical appointments with Obaisi, scheduled for September 18, October 14, November 18, and December 16, were all rescheduled due to facility-wide lockdowns. During this stretch, Knuth's medical records appear to show that he

15

was seen by medical staff at least three times in October and at least once in both November and December.

On January 6, 2015, Knuth saw an orthopedic specialist at UIC Hospital.   The orthopedic surgeon requested Knuth to undergo an MRI of his back.  Upon his return to Stateville, Obaisi prescribed him Tylenol with Codeine #3.  On January 18, Obaisi renewed the Tylenol #3 prescription.  Three days later, on January 21, Obaisi saw Knuth and prescribed him an abdominal binder.  Knuth was approved for an MRI the following day.  On January 26, Obaisi prescribed Knuth Motrin and an analgesic balm.  On March 27, 2015, Knuth was seen by Obaisi for re-evaluation of his back pain complaints. Obaisi alternated his narcotic pain medications between Tramadol and Tylenol #3.

On April 16, 2015, Obaisi evaluated Knuth again.  Obaisi testified that Knuth had been observed making inappropriate use of his crutch.  Obaisi consequently determined that the crutch was no longer medically necessary, and he took it away from Knuth.  Knuth stated that he would fall right away if the crutch was taken.  Indeed, Knuth did go to the ground as the crutch was removed, though the medical notes reflect this as Knuth "pretend falling."

On April 22, 2015, Knuth was sent to UIC for an MRI of his back.  His followup with Dr. Obaisi was rescheduled from April 27 to May 5 due to a facility-wide lockdown. On May 5, Knuth was seen by Obaisi to review the results of his MRI.  Obaisi explained the results to Knuth, prescribed him additional narcotic pain medications, and informed him that he would be sent back to Siemionow for

16

evaluation.

On June 2, 2015, Knuth went to UIC for his follow-up with Dr. Siemionow, who recommended that he undergo a CT scan and a course of physical therapy. Siemionow also requested a return visit in three months. One month later, on July 2, Obaisi examined Knuth and informed him that he would be sent for a CT scan of his back. Obaisi also renewed Knuth's narcotic prescription and permits for a low bunk/gallery. Throughout August and September, Knuth received nine physical therapy sessions, where he learned exercises and stretches that were designed to help his back pain.

On September 29, 2015, Knuth's MRI was conducted at UIC Hospital. The "Impression" listed on the resulting MRI Report reads, in part, as follows:

> Stable findings demonstrating severe spinal canal and bilateral foraminal stenosis at the L5-S1 level secondary to a combination of degenerative disc disease and epidural lipomatosis. A grade 1 anterolisthesis of L5 on S1 is again seen. Evaluation for spondolysis is limited.

IDOC and Lemke contend that these findings "confirm[] Plaintiff's prior diagnosis." Knuth disagrees, asserting that the findings "demonstrate[] a worsening of Plaintiff's condition from the prior MRI taken on April 22, 2015."

Knuth's next appointment with Dr. Obaisi, scheduled for October 12, 2015, was rescheduled to October 20 due to a facility-wide lockdown. Knuth saw Obaisi on October 20, who renewed Knuth's pain medication prescriptions and scheduled a follow-up visit in two weeks. On November 3, 2015, Obaisi again saw Knuth to inform him of a follow-up date with Siemionow.

On December 1, 2015, Knuth returned to UIC Hospital for a follow-up. Knuth was ordered to return in six months for another follow-up, and Siemionow requested another CT scan of Knuth's back. Siemionow also ordered an epidural steroid injection at the L5-S1 vertebrae. The CT scan was approved on December 29.

Knuth was next scheduled to see Obaisi on February 25, 2016, but it was rescheduled due to a facility-wide lockdown. Nonetheless, Knuth's prescriptions were renewed on that date. On March 10, 2016, Obaisi saw Knuth again, increasing his pain medication dosages and adding new medications. Also in 2016, Knuth was sent out to UIC for the recommended series of three epidural steroid injections designed to address his back complaints. Finally, Knuth testified that at some point in 2016, when he was in "segregation," he went "three months without any pain medication; sat in the hole with no medication."

Before testifying that he would defer his medical treatment to doctors, Knuth testified that his inadequate medical treatment at Stateville is borne out by his continuing issues with pain. Knuth also stated that nobody ever told him that his condition could not be fixed. Knuth does not know, however, whether the surgery he has requested for his back would actually resolve his complaints nor if he is a viable candidate for such surgery. Dr. Davis testified that she does not believe Knuth is a surgical candidate, stating, "Because of the chronic degenerative nature of this disease, it does tend to get worse over time, and sometimes surgery does more harm than good." Knuth currently receives pain medications twice per day.

18

As a result of his back pain, Knuth confines himself to his cell but for twiceweekly walks in the prison yard. Knuth testified to his passion for drawing, stating that he cannot sit and draw for as long as he used to and he also can no longer lift weights. When asked to describe the emotional distress that his back condition causes him, Knuth testified that "it is very nerve-racking. It makes me angry." Knuth also testified that the physical limitations brought about by his back issues are "stressful." IDOC and Lemke contend that these claims are the extent of Lemke's emotional distresses. Knuth disagrees, asserting that his extreme pain, including testimony about "unbearable pain," "living like a vegetable," and having gone months without medication, further evidences emotional distress. Knuth also testified to constant pain and an inability to sleep.

### e. Role of Defendant Michael Lemke

Although Knuth testified to having been aware of Lemke's role as warden of Stateville, Lemke does not recall having ever spoken to Knuth or received any letters from Knuth regarding the adequacy of his back pain treatment.

Lemke is not a doctor, and his medical training is limited to basic CPR and a first aid class he took while in the Illinois Army National Guard. Knuth testified that he "[had] no idea" and "[didn't] know" whether Lemke had any medical training. Had there been a conflict between Knuth's treating doctor and Lemke over Knuth's course of treatment, Knuth would have deferred to his doctor. Lemke testified that rather than Lemke

19

himself, it "would be the medical staff" that makes medical decisions, such as outside referrals for surgery.

Lemke declared that he "must give deference" to the prison's medical professionals because he had "no authority or ability to contradict a medical professional's opinion regarding the medical care of an inmate." Therefore, Lemke "[did] not interfere, deny, restrict access to or prevent inmates, specifically…Knuth, from medical care or treatment unnecessarily." In Lemke and IDOC's view, this demonstrates that Lemke cannot make medical decisions on behalf of inmates. Knuth disagrees, noting that Lemke testified that he recalled getting involved with the medical care of one inmate at Stateville. Lemke also insists that, while he was responsible for oversight of Stateville's medical facilities, he did not oversee the medical programs. Knuth disagrees here, as well, pointing out Lemke's testimony that, as warden, he was "responsible for every aspect of the facility." "Medical would have fallen under programs," Lemke continued, and "[p]rograms falls under me." The parties do agree that the decision to refer an inmate to an outside specialist is made by the facility medical director, Dr. Obaisi.

Between January 1, 2013 and December 31, 2013, Knuth sent five grievances (the "2013 grievances") regarding his back pain to the warden's office. A sixth was also filed in 2014, after Lemke's tenure as warden had ended. Each grievance was marked "EMERGENCY." Knuth's allegations against Lemke are limited to Lemke's response to these grievances. Lemke testified that the grievance procedure was both the "best option for [an inmate] to air his grievance" and the "official way" to raise an issue with

20

respect to prison conditions. Lemke's office reviewed and returned all of the 2013 grievances, and Knuth was repeatedly advised that his grievances were improperly characterized as emergencies. On May 7, 2013, Lemke's office investigated one of Knuth's complaints by forwarding a copy of his April 28, 2013 grievance to the HCU. While Knuth acknowledges receiving responses from the wardens' office, he testified that Lemke should "have made a better response and said, 'Okay, let's send this man out right now. Let's see what's wrong with him. Let's get him fixed before it gets worse.'"

Although the warden's office is required to respond to inmate grievances marked as emergencies, it was not required to contact medical staff to investigate Knuth's medical-care-related grievances. During his time as warden, Lemke did not personally review all emergency grievances, instead relying on designees to carry out review. These designees, or "grievance officers," lacked medical knowledge. Knuth sought Lemke's intervention in his treatment only because he was the "head of the prison." Knuth also requested to be sent to Dixon Correctional Facility or another facility, such as the "Laser Institute," that would treat his medical conditions.

IDOC may cancel a prearranged medical appointment. Although Knuth missed some medical appointments due to prison lockdowns, Lemke never singled out Knuth to cause him to miss scheduled appointments. Lemke also recalled some offenders at Stateville who had permits, issued by the medical department, for double mattresses. While Lemke could not recall whether any inmates actually possessed double

21

mattresses, he testified that mattresses were issued to inmates by IDOC. Lemke also received a written reprimand during his tenure as warden for improperly following a procedure.

## LEGAL STANDARD

A motion for summary judgment requires the Court to construe all facts and draw all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court considers the "record as a whole." *Morgan v. Harris Trust and Sav. Bank of Chi.*, 867 F.2d 1023, 1026 (7th Cir. 1989).

Northern District of Illinois Local Rule 56.1 requires the "party moving for summary judgment to include with the motion 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to a judgement as a matter of law.'" *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. R. 56.1(a)(3)). "The movant bears the initial burden of showing that no genuine issue of material fact exists." *Genova v. Kellogg*, 2015 WL 3930351, at *3 (N.D. Ill. 2015). "The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on

22

which the movant bears the burden of proof at trial." *Id.* The non-moving party must respond to the movant's Local Rule 56.1(a)(3) statement and may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits. N.D. Ill. R. 56.1(b); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant must support his contentions with documentary evidence of specific facts that demonstrate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

## DISCUSSION

### I.    Motions to Strike

 We address first a number of evidentiary exhibits that Defendants wish stricken from the record for purposes of summary judgment.

### a. The *Lippert* Report

 In his Rule 56.1 responses to both Wexford's and Lemke and IDOC's distinct Statements of Material Facts, Knuth seeks to introduce evidence flowing from a document generated in an unrelated case titled *Lippert v. Godinez*, 10 C 4603, which he refers to as the "Final Report of the Court Appointed Expert" ("*Lippert* Report").

Knuth describes the *Lippert* Report thus:

> In *Lippert*…the parties agreed and nominated…the Court appointed Dr. Ronald Shansky to "assist the court in determining whether [IDOC] is providing health care service to the offenders in its custody that meet the minimum constitutional standards of adequacy."

Defendants move the Court to strike and disregard any reference or argument predicated upon the *Lippert* Report. Citing to Federal Rules of Civil Procedure 26(a)(2)(B) and 37(c)(1), Defendants insist that, because Knuth has not disclosed an expert witness prior to dispositive briefing and Defendants have not had the opportunity to explore the bases of the *Lippert* Report or depose its authors, Knuth should not be allowed to use the document as a surrogate for expert testimony.

We agree, and find that the *Lippert* Report has been introduced by Knuth in flagrant violation of Rule 26(a)(2)(B). The *Lippert* Report was prepared by a medical professional for the ostensible purpose of detailing the medical conditions at Stateville. The introduction of such a report is plainly an attempt to offer expert opinion evidence in lieu of live testimony from the report's author or a similarly qualified medical professional, the sort of evidence which would fall squarely within the strictures of Federal Rule of Civil Procedure 702. Rule 702 expert witnesses carry with them the requirements of Rule 26(a)(2)(B), which governs "Witnesses Who Must Provide a Written Report," and states:

> Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case….

Knuth declined to disclose anything in the way of expert testimony as to the medical conditions present at Stateville. In a recent, on-point case out of a fellow Northern District court, the *Lippert* Report was stricken from evidence where no disclosure was

24

made and no explanation was offered as to how the plaintiff would introduce the report's findings into evidence. *Diaz v. Chandler*, 2016 WL 1073103, at *12 (N.D. Ill. Mar. 18, 2016). As here, the *Diaz* court lacked expert testimony related to the report alongside the nondisclosure. *Id.* Such a failure brings Knuth under Rule 37(c)(1)'s auspices, which governs a "Failure to Disclose or Supplement," and states:

> If a party fails to provide information or identify a witness as required by Rule 26(a)…the party is not allowed to use that information or witness to supply evidence on a motion…unless the failure was substantially justified or is harmless.

Knuth offers nothing in the way of a "substantial justification" to excuse the nondisclosure. Moreover, as the existence of the *Diaz* case demonstrates, the *Lippert* Report has been in existence for some time, so its last-minute inclusion cannot be explained by way of newness. As to harmlessness, Knuth relies heavily on the *Lippert* Report for large portions of his arguments concerning Defendants' deliberate indifference. Without an opportunity to, at minimum, depose the report's author, it cannot be said that our reliance on its contents would be anything but a significant injury to Defendants, one potentially prejudicial in effect. Therefore, unless the *Lippert* Report can be judicially noticed, it is inadmissible.

 Once more, the *Diaz* court is instructive, having already exactingly analyzed the judicial notice question. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's discretion; or (2) can be accurately and readily determined from sources whose accuracy cannot

reasonably be questioned." Fed. R. Evid. 201(b). "However, judicial notice 'merits the traditional caution it is given, and courts should strictly adhere to the criteria established by the Federal Rules of Evidence before taking judicial notice of pertinent facts.'" *Diaz*, 2016 WL 1073103, at *12 (quoting *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997)).

Here, as in *Diaz*, there is no contention that the *Lippert* Report is the finding of any court. Moreover, "even materials generally determined to be from reliable sources are not judicially noticeable." *Diaz*, 2016 WL 1073103, at *12. "[Federal Rule of Evidence] 201…makes facts of which judicial notice is properly taken conclusive, and therefore requires that their accuracy be indisputable for judicial notice to be taken of them…. There is a high standard for taking judicial notice of a fact, and a low standard for allowing evidence to be presented in the conventional way, by testimony to cross-examination…." *Rowe v. Gibson*, 798 F.3d 622, 629 (7th Cir. 2015).

The *Lippert* Report was undisclosed, its reliability is unknown, it was prepared for another case, and it includes no discussion whatsoever of the plaintiff in this matter, the Defendants' interactions with him, nor the viability of a deliberate indifference claim against any of the Defendants. Its unreliability forecloses the possibility of judicial notice, and its nondisclosure and prejudicial nature subject it to the sanctions of Rule 37(c)(1). The *Lippert* Report is stricken, and any references or arguments predicated upon its existence are disregarded.

**b. Wexford Provider Handbook, Wexford Pharmacy Policies & Procedures Region – Illinois, & Wexford Medical, Psychiatry, & Dental Staff Orientation Program**

Wexford moves the Court to strike all three of the Handbook, the Wexford Pharmacy Policies and Procedures Region – Illinois ("Pharmacy Policies"), and the Orientation Program (collectively, "Wexford Programs"), for having been introduced without the proper foundation, as inadmissible hearsay, and as irrelevant material. Knuth does not argue against Wexford's objections in his briefing, but, as with the *Lippert* Report, he nonetheless makes repeated reference to the exhibits throughout his arguments. "The evidence relied upon must be competent evidence of a type otherwise admissible at trial. Thus, a party may not rely upon inadmissible hearsay…to oppose a motion for summary judgment." *Bombard v. Fort Wayne*

*Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).
As to foundation, then, we overrule Wexford's objections. While the Wexford Programs may not have been introduced at the Rule 56 stage with proper foundation, the Court is confident that such documents lend themselves to clean and simple Federal Rule of Evidence 901 authentication at the trial stage.

Federal Rule of Evidence 403 states that a piece of evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Wexford argues that the Wexford Programs are "superseded by the Administrative and Institutional Directives of [IDOC] and are never a substitute for the medical providers' independent medical

27

judgment." Even if true, the Wexford Programs would still offer a window into the policies, procedures, and professional expectations of the policymakers in charge of the lone medical service provider to which Knuth had direct access. Evidence flowing from the Wexford Programs may not directly concern Knuth's particularized medical care, but the doctors who treated him were subject to their guidance and oversight. As our discussion of the law reveals, *infra*, such policies and procedures can play an important role in § 1983 cases implicative of private corporations. Wexford's relevancy objection is denied.

As to hearsay, we are not convinced that the Wexford Programs' contents are being offered for their truth in the first instance. *See* Fed. R. Evid. 801(c). An assertion that medical prison officials carried out policies and procedures in place above them does not rely on the veracity of the policies and procedures themselves.

Rather, the truth being asserted hinges on the officials' understanding that they were subject to those policies. Moreover, even if the Wexford Programs were being offered for the truth of their contents, they qualify as a Rule 803(6) business records exception to the hearsay rule. All three documents carry the signature of Wexford's Corporate Medical Director, the Handbook and Orientation Program carry a date of effectiveness of June 8, 2012, and the Pharmacy Policies reflect a June 4, 2013 date. These dates would render each document operational during at least a portion of the term in which Knuth struggled with back pain, and their authentication at trial seems both plausible and probable.

For those instances where the contents of the Wexford Programs are not being offered for the truth of the matter asserted, they are admitted as non-hearsay. For all other instances, they are admitted as business records exceptions under Federal Rule 803(6). Wexford's objections as to the Wexford Programs are overruled.

## II.    Count I: "Failure to Provide Adequate Medical Treatment"

While Knuth states Count I as a "Failure to Provide Adequate Medical Treatment" in violation of both the Eighth and Fourteenth Amendments, as an inmate, the more accurate posture of his cause of action is that of an Eighth Amendment claim of deliberate indifference to serious medical needs.[5] Lemke, IDOC, and Wexford seek summary judgment in their favor on the deliberate indifference action for a variety of distinct reasons: A) that there is no evidence that Lemke was deliberately indifferent to Knuth's medical condition; B) in the alternative, that Lemke is entitled to qualified immunity; C) that the doctrine of sovereign immunity bars the claim against IDOC; D) that there is no evidence that Wexford was deliberately indifferent; and E) in the alternative, that there is no competent evidence of harm or damages such that Wexford is susceptible to § 1983 liability. We address each argument in turn.

### A. Whether There Exists a Triable Issue of Fact as to Lemke's Purported Deliberate Indifference to Knuth's Serious Medical Needs

---

[5] Functionally, this is a distinction without a difference. It is the Eighth Amendment that grounds deliberate indifference claims for inmates; pretrial detainees initiate deliberate indifference claims via the Fourteenth Amendment. *Smith v. Sangamon Cnty. Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013). Such Fourteenth Amendment claims are "governed by the same standards as a claim for violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Id.*

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "A claim of deliberate indifference…contains both an objective and a subjective component." *Greeno*, 414 F.3d at 653. "To satisfy the objective component, a prisoner must demonstrate that his medical condition is 'objectively, sufficiently serious.'" *Id.* (*quoting Farmer v. Brenna*, 511 U.S. 825, 834 (1994)). There is no argument from Lemke or IDOC that Knuth's back issues were anything but serious. Hundreds of pages of deposition testimony from Knuth and his treating physicians alongside hundreds more pages of medical documents demonstrate a serious health condition. Knuth has satisfied the objective component.

"To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (internal citations and quotation marks omitted). "[T]he warden must have been 'both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the warden] must also have drawn the inference.'" *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (*quoting Farmer*, 511 U.S. at 837). "[I]t is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno*, 414 F.3d at 653.

Knuth relies primarily on the *Gray* case, cited *supra*, contending that since the "grievance and response in *Gray* were sufficient to create a triable issue of fact on

30

deliberate indifference, so too should Knuth's grievances create a triable issue of fact." In *Gray*, the plaintiff inmate filed a grievance complaining of unsanitary living conditions and a pest infestation that were causing him health problems, marked the grievance "emergency," and addressed it directly to the warden. *Gray*, 826 F.3d at 1004. Having heard no response on the merits, the inmate resubmitted the grievance and, almost one full year later, received a response signed by a grievance officer and the warden. The response stressed that the prison was aware of the problem and was making "every effort" to keep wildlife out of the facility. *Id.* The Seventh Circuit held that such a grievance-and-response procedure was enough to demonstrate the warden's awareness, and the court denied him summary judgment on the plaintiff inmate's § 1983 deliberate indifference claim. *Gray*, 826 F.3d at 1008.

Here, Lemke revealed a similar degree of awareness as did the defendant warden in Gray when his office responded to each and every grievance that Knuth filed. Indeed, Lemke went a step further, forwarding one such grievance to Stateville's HCU. Pointing to § 1983's requirement that a defendant be "personally responsible for the deprivation of a constitutional right" in order for a plaintiff to recover damages, Lemke stresses repeatedly that he himself was unaware of Knuth's back condition and thus drew no inferences from said condition. *Knight v. Wiseman*, 590 F.3d 458, 462—63 (7th Cir. 2009). Seeking to differentiate himself from the *Gray* warden, Lemke notes that nothing in the record establishes that he "personally reviewed any of [Knuth's] emergency grievances." However, the only suggestion in *Gray* that

the defendant warden had firsthand knowledge of the plaintiff inmate's complaint came by way of a single signature:

> Gray's grievance demonstrates the prison and warden's knowledge of the conditions about which he is complaining. The response he received was signed by Warden Hardy. The grievance and response are thus sufficient to create a triable issue of fact on deliberate indifference.

826 F.3d at 1008. Here, Lemke's signature is plainly visible in the "Emergency Review" section of at least four of Knuth's grievance, and it appears to the Court as though it is likely present in the same section on the fifth, Knuth's July 18 grievance, in short form. The Seventh Circuit was unequivocal in extending personal responsibility to the defendant warden in *Gray* where his office was aware of the plaintiff's grievance, affirmatively responded to it, and the warden's signature was present. *Id*. Here, Lemke's office received all of Knuth's 2013 grievances, it responded to each of them, forwarded one to the HCU, and Lemke's signature was assuredly present on four, and likely all five grievances. Under *Gray*, this is more than enough to establish Lemke's awareness of Knuth's medical needs.

The deliberate indifference inquiry does not stop, however, with a showing of mere knowledge in the Seventh Circuit. "Indeed, prison officials who actually knew of a substantial risk to inmate health…are free from liability if they responded reasonably to the risk, even if the harm was ultimately not averted, because in that case it cannot be said that they were deliberately indifferent." *Peate v. McCann*, 294

32

F.3d 879, 882 (7th Cir. 2002). Where non-medical administrators are concerned, the Seventh Circuit has "adopt[ed] the reasoning of the Third Circuit...which held that 'if a prisoner is under the care of medical experts...a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'" *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (*quoting Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

Knuth's § 1983 claim against Lemke is limited to the warden's handling of the 2013 grievances. Knuth testified that Lemke should have "made a better response and said, 'Okay, let's send this man out right now...see what's wrong with him [and] get him fixed before it gets worse.'" The record, however, demonstrates that prior to, throughout, and continuing beyond Lemke's tenure as warden, Knuth's back pain was consistently and frequently attended to by Drs. Davis and Obaisi. Knuth's first grievance was filed on April 18, 2013 and signed by Lemke on April 25, 2013. Just five days before filing his April 18 grievance, Knuth was seen by Obaisi after a short stay in the infirmary. Five days after filing the grievance, he was seen again by Obaisi, who noted Knuth's improved ambulation. Then, just five days after Lemke signed the grievance, Knuth was again seen, this time by Dr. Davis. Approximately one week after Knuth's appointment with Davis, Lemke's office forwarded another of Knuth's grievances to the HCU. Throughout the remainder of 2013, Knuth's back was consistently attended to by Davis and Obaisi. Knuth was even transported to Presence St. Joseph Hospital in late 2013 for a CT scan of his back.

33

Unlike the *Gray* plaintiff, Knuth offers nothing in the way of facts to suggest Lemke's complicity in the development or exacerbation of Knuth's back conditions. Rather, he admits that he first experienced pain in late 2011 or early 2012, well before Lemke's 2013 wardenship commenced. Knuth merely complains that Lemke should have done more in his role as warden to alleviate pain. However, "an inmate's disagreement with the course of treatment cannot establish deliberate indifference." *Jones v. Van Fleit*, 49 Fed.Appx. 626, 628 (7th Cir. 2002).

The record demonstrates that Lemke's office responded to Knuth's grievances in a timely manner and forwarded one such complaint to the expertise of the HCU shortly after being made aware of the problem. Lemke's handling of the grievances occurred alongside Knuth's consistent and frequent medical treatment at the hands of licensed medical professionals. In deliberate indifference scenarios, the Seventh Circuit has consistently found a grant of summary judgment warranted on records demonstrative of non-medical prison officials' attentiveness to prisoner complaints coupled with deference to professional medical treatment. *See Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (summary judgment in prison warden defendant's favor where the warden "was aware of [the plaintiff inmate's] complaints of pain and made sure that medical care was available…"); *Hayes*, 546 F.3d at 527— 28 (summary judgment in non-medical prison officials' favor where they "responded readily and promptly to each of [the plaintiff inmate's] letters and grievances," relied on the "professional judgment of medical prison officials," and had no reason to believe that the plaintiff's medical

34

treatment was inadequate); *Berry v. Peterman*, 604 F.3d 435, 440—41 (7th Cir. 2010) (summary judgment in non-medical prison administrator's favor where he "was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the plaintiff inmate]"). Here, on the record before the Court and as a matter of law, Lemke responded reasonably to Knuth's 2013 grievances. We grant summary judgment in his favor on Count I.

### B. Lemke's Entitlement to Qualified Immunity

Considerations of qualified immunity are only necessary if the Court first determines that "the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right." *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). Here, in our grant of summary judgment to Lemke on Count I, we determined that Lemke did not violate the Eighth Amendment's proscription on cruel and unusual punishment. Having already settled the constitutional question in

Lemke's favor, qualified immunity is no longer applicable; the issue is moot.

### C. IDOC's Entitlement to Sovereign Immunity

"It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). Moreover, "in enacting § 1983, Congress did not intend to override wellestablished immunities or defenses under the common law." *Will v. Mich. Dept. of*

*State Police*, 491 U.S. 58, 67 (1989). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Id*. at 71. Therefore, both IDOC and Lemke, in his official capacity as warden, are immune from this § 1983 action, unless some exception to the sovereign immunity doctrine applies.

The only possible exception Knuth identifies, that "[s]overeign immunity affords no protection…when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority," is inapplicable on its face. We have already determined that no constitutional violation occurred, and Knuth offers no argument that Lemke acted in excess of his authority. Nor does anything in the record suggest authoritative overreach on Lemke's behalf. Moreover, while sovereign immunity does not bar Knuth from seeking injunctive relief from Lemke in his official capacity, *Knox v. McGinnis*, 998 F.2d 1405, 1412—13 (7th Cir. 1993), where there is no violation to warrant relief, no such relief can be had. Lemke's actions did not rise to the level of a constitutional violation and no showing has been made of a violation by any other state employee. Without a problem to rectify, there is no cause of action to be maintained against IDOC. Sovereign immunity bars Knuth's § 1983 claim against IDOC, injunctive relief is unavailable, and summary judgment is entered in IDOC's favor on Count I.

**D. Whether There Exists a Triable Issue of Fact as to Wexford's Purported Deliberate Indifference to Knuth's Serious Medical Needs**

36

In *Iskander v. Village of Forest Park*, the Seventh Circuit held that "just as a municipal corporation is not vicariously liable upon a theory of respondeat superior for the constitutional torts of its employees, a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." 690 F.2d 126, 128 (7th Cir. 1982). The *Iskander* decision effectively extended the *Monell v. Department of Social Services* standard, that it is only when a local "government's policy or custom…inflicts the injury that the government *as an entity* is responsible under § 1983," to private corporations such as Wexford. 436 U.S. 658, 694 (1978) (emphasis added). And while our reviewing court recently recognized "substantial grounds to question the extension of the *Monell* holding…to private corporations," it ultimately affirmed that very doctrine, holding explicitly that "this circuit's case law still extends *Monell* from municipalities to private corporations." *Shields v. Ill. Dept. of Corrections*, 746 F.3d 782, 790, 796 (7th Cir. 2014).

This presents a problem for the Court based on the parties' briefings. Both Wexford and Knuth argue for and against Wexford's § 1983 liability on the basis of the alleged deliberate indifference of its employees, Drs. Obaisi and Davis. To be sure, "[w]hen a medical professional acts in his professional capacity, he may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). This standard only

applies to the doctors themselves, however. In this case, no attorney has filed an appearance on behalf of an individual medical defendant, and it has been represented to the Court that no such defendant has been served in this matter, either. The Court is befuddled as to why both parties relegate the majority of their arguments to the doctors' culpability, when no doctor is a party to the case, and the governing law flatly rejects the utilization of *respondeat superior* as a vehicle for municipal or corporate liability.

In *Shields*, the court stated that to "recover against Wexford under our current precedent, [the plaintiff] must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." 746 F.3d at 796. This standard is frequently analyzed under the tripartite test promulgated in *Thomas v.*

*Cook County Sheriff's Department*:

> A local governing body may be liable…under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority.

604 F.3d 293, 303 (7th Cir. 2010). Although neither party conducts a thorough analysis of Wexford's liability under the *Shields*, *Thomas*, or *Monell* dictates, each party does include some relevant discussion of Wexford's *Monell* liability. And, indeed, portions of the *Thomas* test necessarily contemplate the individual conduct of the private entity's employees. Therefore, on the record before the Court and based on the briefings of the

parties, we are confident that we can carry out a fair examination of Wexford's request for summary judgment under *Shields* and *Thomas*.

We address the *Thomas* lines of inquiry in reverse order.

### 1) Policymaker Theory

"To create liability for the corporate entity—whether municipal or private—the official in question does not have to be 'a policymaker on all matters for the entity, but only a policymaker in the particular area, or on the particular issue.'" *Awalt v. Marketti*, 74 F.Supp.3d 909, 933 (N.D. Ill. 2014). (quoting *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009). "[H]elpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Valentino*, 575 F.3d at 676.

To the extent that he affirmatively argues the policymaker theory, Knuth's contention goes something like this: because Dr. Obaisi was the medical director, he was necessarily responsible for the scheduling of Knuth's medical appointments, and therefore, the cancellation of any such appointments are assuredly attributable to Obaisi. If true, and if such cancellations rose to the level of deliberate indifference, then Wexford would necessarily be liable for the unconstitutional delays in treatment instituted by its authorized policymaker, Obaisi. *See McGowan v. Hulick*, 612 F.3d

636, 640 (7th Cir. 2010) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain").

The record, however, stands in full-throated contravention of such a posture. Knuth concedes that lockdowns, which were far and away the most common cause of Knuth's cancelled appointments, fall under the discretionary powers of Warden Lemke and IDOC. To frame Wexford's role in the lockdown-and-cancellation procedure in terms of the *Valentino* factors: (1) Obaisi and his staff were constrained by the whims of IDOC as to when lockdowns went into effect; (2) Obaisi did not make the decision, so no review would have come into play; and (3) nothing in the record suggests that Obaisi possessed the power to initiate a facility-wide lockdown. If there was a policy in place at Stateville of locking down the prison in such a manner that worsened Knuth's physical ailments, it was certainly not initiated by anyone employed by Wexford, and the company cannot be held liable for deliberate indifference on such grounds.

### 2) Widespread Custom or Practice Theory

"To demonstrate that [the corporate entity] is liable for a harmful custom or practice, the plaintiff must show that [the corporate entity's] policymakers were 'deliberately indifferent as to the known or obvious consequences.'" *Thomas*, 604 F.3d at 303 (*quoting Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002)). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604

40

F.3d at 303. "[T]he Seventh Circuit has made clear that, absent an express policy, *Monell* liability is only appropriate where the 'plaintiff can introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Awalt*, 74 F.Supp.3d at 935 (*quoting Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006)). The overwhelming majority of Knuth's argument as to any sort of improper or inadequate customs and policies that Wexford allowed to pervade the Stateville medical unit stems from the *Lippert* Report, which we have stricken from consideration. The only evidence still in the record about a faulty practice that exacerbated Knuth's condition concerns appointment cancellation procedures. We have already determined that Wexford is not responsible for facility-wide lockdowns. However, the record does reveal a few appointments that were cancelled because of time constraints or a lack of a service provider. It also appears that Wexford employs a scheduler who handles the rescheduling of cancelled appointments for patientinmates. Apart from the simple fact that this scheduler exists, there is nothing in the way of evidence contemplative of her[6] role as a policymaker or the breadth of authority that she wields in handling prisoner's calendars. Because her role as policymaker in the cancellation and scheduling realm cannot be adequately analyzed on the record before the Court, we instead examine Wexford's cancel-and-reschedule practices under the widespread practice lens.

---

[6] The record does not reveal the scheduler's gender identity. The Court chooses to use the feminine pronoun simply to make clear that neither Obaisi nor Knuth, both of whom are male, occupies the role of scheduler.

Cancellations and reschedules occurred with some frequency during Knuth's tenure at Stateville. Knuth, however, primarily confines his argument to a stretch from April 2014 through January 2015, when he claims that he went months without seeing Dr. Obaisi due to a string of cancellations. Immediately, we reject Knuth's contention that Wexford policy is responsible for any inadequate treatment Knuth received between the end of September 2014 and January 2015. During that stretch, Knuth had four consecutive appointments cancelled as a result of facility-wide lockdown. In each instance, his appointment was rescheduled, only for it be cancelled again due to lockdown. This string of incidents, unfortunate though it may be, was decidedly out of Wexford's control.

The relevant period shrinks, then, to the five months between Knuth's April 5 visit with Obaisi and his cancelled September 5 appointment with the doctor. During this term, Knuth had two dates cancelled due to time constraints and three others cancelled because no medical service provider was available. Knuth also failed to show up for two appointments during this stretch. The record reveals that each one of these missed or cancelled appointments was rescheduled for a new appointment date within 3 weeks of the cancelled appointment. Knuth was also continuously seen by the HCU and had his prescriptions consistently refilled. The longest Knuth went without being seen by Wexford medical staff during this stretch was approximately five weeks from May 2014 to June 2014. He was even attended to by the HCU at least five times from October 2014 to December 2014, when his doctor visits were cancelled due to lockdowns.

42

The Court can find no evidence in the record of any other time frame even approaching a five-month break between Knuth's visits with Obaisi or Davis. "[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three." *Thomas*, 604 F.3d at 303 (*quoting Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)). Even if it were evident that a single dry spell in doctor visits inherently exacerbated Knuth's condition – a condition that, by its own terms, is a progressive condition, worsening over time even with proper treatment – governing law requires some actual frequency for a court to find a widespread custom or practice. One instance does not rise to that level. Moreover, Knuth himself "no showed" at least two missed appointments during the time frame, and all of Knuth's missed appointments, regardless of why they came about, were consistently rescheduled for a quick turnaround. It cannot be said that Wexford, whose employees demonstrated regular time and attention to Knuth, sanctioned anything approaching a practice "so pervasive that acquiescence on [Wexford's] part…was apparent and amounted to a policy decision." *Phelan*, 463 F.3d at 790.

### 3) Express Policy Theory

Lacking clear evidence of "a series of violations to lay the premise of deliberate indifference," *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003), a plaintiff may demonstrate unconstitutional deliberate indifference where a defendant entity "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Here, over

43

Wexford's objection, we have allowed into evidence the contents of all three Wexford Programs, the Handbook, the Orientation Program, and the Pharmacy Policies. Knuth marshals precious little evidence from the Wexford Programs in his opposition brief. However, his Statement of Additional Facts suggests five particular excerpts,[7] four from the Handbook and one from the Orientation Program, that might ground liability. The first two concern the manner in which the Handbook advises Wexford employees to go about the recordation process. Knuth argues that Wexford "trains its medical staff to not include everything in the medical record, especially damaging information," citing to two passages from the Handbook for support. A single reading of those passages, however, reveals precisely the opposite. The Handbook's plain language is an encouragement to Wexford employees to record "adverse events promptly and accurately" and keep "objective, descriptive, and concise" entries. Indeed, in the entries immediately before and after those cited by Knuth, the Handbook advises, "Chart ALL inmate encounters!" and "Write so others can read what you wrote." Knuth's gloss on these policies, that Wexford is training its employees to keep incomplete records, is wrongheaded, misleading, and the opposite of what the plain language of the Handbook expresses.

Knuth next highlights a section of the Orientation Program that vests medical decision-making authority solely in health care personnel and states that such decisions "are

---

[7] The relevant portions of each excerpt can be found, in their entirety, in this Opinion's Background, § c.

never compromised for security reasons." However, in the very same section, the Orientation Program concedes that the primary function of prisons is security, not medical services, and sometimes "other institutional activities may interfere with your ability to see a particular patient." This policy aligns with the parties' agreed factual assertion that IDOC is responsible for the cancellation of medical appointments brought about by facility-wide lockdowns. On the record before the Court, Wexford's employees made a consistent effort to ensure that Knuth had access to medical treatment, even when lockdowns interfered with their ability to see him. In this instance, Wexford policy accurately predicted a source of conflict in the prison, its personnel carried out their duties in keeping with said policy, and the policy itself led to no unconstitutional misconduct.

The fourth excerpt, the Handbook's caution against physical therapy modalities, likewise does not represent an express policy that led to deliberate indifference. The language of the policy is merely an equivocation, an endorsement as to their usefulness as "helpful adjuncts," coupled with a caution that physical therapy for chronic back cases "may soothe the mind, but [do] nothing to soothe the back." This is not a commendation of this line of treatment, nor a prohibition on its prescription. Knuth frames this policy as evidence that Wexford "[knew] of the medical shortcomings of…Knuth's treatment yet failed to do more." Knuth was treated with a panoply of prescription drugs, was routinely attended to by health care staff throughout his stay at Stateville, and was referred to outside specialists on multiple occasions. As we have

45

already detailed, Knuth's disagreement with his treatment does not relegate said treatment to the province of deliberate indifference, and his cited policy language did not create an atmosphere of the same.

 The fifth and final policy snapshot also comes from the Handboook, where only "monitoring" is required of pre-existing conditions.  As was the case with the previous four excerpts, this bit of policy language did not lead to a deliberately indifferent medical staff where Knuth's back pain was concerned.  In the same Handbook section, Wexford advises that pre-existing conditions should be identified as early as possible so that a "program of individual care that seeks to maintain inmate health" can be designed.  Moreover, conditions that are aggravated by incarceration require treatment. Nothing in the Handbook licenses medical ignorance of preexisting injuries, and it is clear that in the case of Knuth, no assertions of such ignorance could be plausibly maintained.  Indeed, for Knuth, it is readily apparent that his back condition was not merely monitored, but frequently and attentively treated.  Years of prescription drugs and outside referrals signal to the Court a medical unit that did precisely as the Handbook suggests in creating an individualized care program with regular treatment. We can find no § 1983 liability from a policy that led to such a tailored medical program.

*      *      *

Our analysis of the *Thomas* test reveals that there is no issue of material fact requiring fact-finding on the issue of Wexford's *Monell* liability for deliberate indifference under § 1983.  We award summary judgment in its favor on Count I.[8]

### III.    Count III: Intentional Infliction of Emotional Distress

Knuth's remaining count is a state law action against Defendants for intentional infliction of emotional distress ("IIED").  "An [IIED] claim under Illinois law requires proof of three elements: 'First, the conduct involved must be truly extreme and outrageous.  Second, the actor must intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress.  Third, the conduct must in fact cause severe emotional distress.'"  *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) (*quoting Feltmeier v. Feltmeier*, 207 Ill.2d 263, 278 (2003)).

### A. Lemke & IDOC's IIED Liability

Knuth's argument that Lemke and IDOC perpetrated extreme and outrageous conduct boils down to his assertion that "Plaintiff reached out to Lemke and was ignored in his requests relief."  The Court has already considered this line of argument and rejected it, finding a record probative of a warden who displayed attentiveness and responsiveness to Knuth's grievances.  Lacking anything further, the Court finds nothing to indicate

---

[8] Having awarded summary judgment to Wexford on the deliberate indifference claim, we decline to address Wexford's alternative ground for judgment in its favor, whether there is competent evidence of harm or damages such that Wexford is liable under § 1983.

47

that Lemke's conduct was "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftal Broadcasting Corp.*, 154 Ill.2d 1, 21 (1992). Moreover, the parties agree that Lemke never singled out Knuth to cause him to miss scheduled appointments, and there is no evidence whatsoever that Lemke or anybody employed by IDOC intended to emotionally disturb Knuth. Without evidence of extreme conduct or intent, the IIED claim presents no issue of material fact, and summary judgment is awarded in Lemke and IDOC's favor on Count III.

### B. Wexford's IIED Liability

"An employer is vicariously liable for the tort of its employee only if the tort is committed while the employee is acting within the scope of his or her employment." *Maras v. Milestone*, 348 Ill.App.3d 1004, 1007 (2004). There is no contention here that any of Wexford's employees engaged with Knuth in a manner inconsistent with the scope of their employment. Therefore, if any of the medical staff intentionally inflicted emotional distress upon Knuth, Wexford would be vicariously liable.

Knuth's argument fails here for the same reasons it fails against Lemke and IDOC, he can demonstrate neither extreme and outrageous conduct nor intent. Knuth received constant attention to his back complaints, he was prescribed myriad prescription medications in an effort to alleviate his pain, and he was sent out to specialists for further attention. Knuth's lone paragraph of argument on the extreme and outrageous element amounts to his telling the Court of his discontent with only being allowed to see

48

Wexford's medical professionals. That Knuth wanted to see other doctors, which he did when he was referred to UIC and Presence St. Joseph Hospital, does not in any way amount to a contention that the doctors he did see treated him beyond the bounds of human decency.

Additionally, Knuth provides no legitimate argument on the intent prong, merely stating that because language exists in the Handbook allowing for the simple monitoring of pre-existing injuries, Wexford and its doctors must have intended emotional distress. No testimony exists suggesting that Wexford health care providers were out to harm or disturb Knuth. Rather, the record evidence that does exist suggests health care employees who sought to improve Knuth's symptoms. Indeed, if anything, Wexford's employees seemed intent on helping Knuth. No issue of material fact exists on the questions of Wexford's employees' extreme and outrageous conduct or intent. Summary judgment on Count III is awarded in its favor.

## CONCLUSION

For the aforementioned reasons, the Court grants Defendants' motions for summary judgment and enters judgment in their favor on Counts I and III. It is so ordered.

Dated: 3/12/2018

Charles P. Kocoras
United States District Judge